Terry GLASPEY, Petitioner and Appellant,

v.

Richard BACKES, Director, North Dakota Department of Transportation, Respondent and Appellee.

Civ. No. 900162.

Supreme Court of North Dakota.

Nov. 13, 1990.

Schoppert Law Firm, Minot, for petitioner and appellant; Thomas K. Schoppert (argued).

Gregory B. Gullickson (argued), Asst. Atty. Gen., Bismarck, for respondent and appellee.

LEVINE, Justice.

Terry Glaspey appeals from a district court judgment upholding an administrative suspension of Glaspey's driver's license. We reverse.

Glaspey was arrested for driving while under the influence of intoxicating alcohol. Glaspey was notified of the intent to suspend his driving privileges and he requested and received an administrative hearing. The results of a blood test showing that Glaspey had a blood alcohol content of .15 percent on the night of his arrest were introduced into evidence. The hearing officer concluded that Glaspey had operated a motor vehicle with a blood alcohol concentration of least .10 percent in violation of Section 39–08–01, N.D.C.C. Glaspey's driver's license was suspended for 91 days. He appealed the hearing officer's decision to the district court, which affirmed the suspension.

On appeal to this court, Glaspey asserts that the results of his blood test should not have been admitted into evidence because the State failed to show that the procedure used for obtaining the sample was in compliance with the State Toxicologist's procedures. More specifically, Glaspey asserts that the State failed to show that a non-alcoholic, non-volatile skin disinfectant was used, as required by the State Toxicologist.

Blood sample test results are admissible under Section 39–20–07, N.D.C.C., only after the proponent establishes fair administration of the test under subsection (5) of that provision:

"The results of the chemical analysis must be received in evidence when it is shown that the sample was properly obtained and the test was fairly administered, and if the test is shown to have been performed according to methods and with devices approved by the state toxicologist, and by an individual possessing a certificate of qualification to administer the test issued by the state toxicologist."

The State Toxicologist has drafted a nine-step process for collecting and submitting blood samples. *Schwind v. Department of Transportation*, 462 N.W.2d 147 (N.D. 1990); *see also State v. Schwalk*, 430 N.W.2d 317, 322 (N.D.1988). Fair administration may be established only through proof of compliance with the State Toxicologist's directions which go to the scientific accuracy of the blood test or through expert testimony establishing the scientific accuracy of the test. *Schwind, supra.*

As part of the nine-step process for blood sample collections, the State Toxicologist requires the use of a "non-alcoholic, non-volatile skin disinfectant." The State Toxicologist explained this requirement in a memorandum issued on July 25, 1988, to "Emergency Room Supervisors," which stated in relevant part:

"[O]ur recommendation was to use a 'non alcoholic, non volatile skin disinfectant'. Aqueous solutions of chlorhexidine, povidone iodine, quaternary ammonium compounds, germicidal soaps, etc. are quite satisfactory for this purpose and fit the description of 'non alcoholic, non volatile skin disinfectant'. In fact, any disinfectant or antiseptic solution marketed for this purpose that does not contain low boiling alcohols like ethyl, methyl, propyl, isopropyl, etc. and vola-

tile organic compounds like ether, chloroform, benzene, acetone, etc. is suitable."

The medical lab technician who collected Glaspey's blood sample testified at the administrative hearing. On the laboratory form, she indicated that she had used a "non-alcoholic, non-volatile skin disinfectant," which she identified as "Povidone Iodine Swab Stick." However, during cross examination the technician was questioned about the disinfectant she had used:

"MR. SCHOPPERT: Do you know what a volatile compound is?

MS. BITTNER: No, sir.

MR. SCHOPPERT: You don't know what that is?

MS. BITTNER: No.

MR. SCHOPPERT: Do you know if your Proviodine [sic] Iodine how do you know if it doesn't, in your own knowledge, how do you know it doesn't contain alcohol or ethyl alcohol?

MS. BITTNER: I don't."

The State Toxicologist's memo directs the use of "aqueous solutions of ... povidone iodine" or any "non alcoholic, non volatile skin disinfectant." Webster's New World Dictionary (2nd College Edition 1978) defines the term "aqueous" as meaning "of, like, or containing water...." The term "povidone iodine" is defined in the Sloane–Dorland Annotated Medical–Legal Dictionary (1987) as follows:

"[A] complex produced by reacting iodine with the polymer povidone, which slowly releases iodine; it occurs as a yellowish brown, amorphous powder and is used as a topical anti-infective."

Absent contrary evidence, we cannot assume that the povidone iodine swab was not in combination with an alcohol substance. The Physicians' Desk Reference (42d ed. 1988) shows, for example, that the product marketed as Anbesol, an antiseptic anesthetic used for temporary relief of mouth pain, contains in its liquid form both alcohol and povidone iodine. So too, a topical solution of povidone idoine may contain alcohol. The United States Pharmacopeia (20th ed. 1979).

The technician candidly acknowledged that she did not know if the povidone iodine swab she used contained an aqueous solution of that chemical or if it contained alcohol. Nor does anything else in the record disclose that information. The State did not offer expert testimony or other evidence to demonstrate that in this instance there was either compliance with the directive, or, alternatively, to show that the test was fairly administered and that the test results are not suspect by the failure to use an approved disinfectant. The State Toxicologist's directive to use a non-alcohol disinfectant goes to the scientific accuracy and reliability of the blood test. Consequently, we conclude that the hearing officer erred in admitting the results of Glaspey's blood alcohol test.

Because Glaspey's license was suspended for his operation of a vehicle while having a blood alcohol content of at least .10 percent, and the blood test results were the only evidence presented to demonstrate that Glaspey's blood alcohol content was .10 percent or greater, the license suspension must be reversed.

In accordance with this opinion, the judgment of the district court upholding the administrative suspension of Glaspey's license is reversed.

ERICKSTAD, C.J., and GIERKE, J., concur.

VANDE WALLE, Justice, concurring specially.

I concur in the result reached by the majority opinion. The issue appears to me to be the construction of the State Toxicologist's memo and if, by that memo, the State Toxicologist permits the use of povidone iodine whether or not it is aqueous or whether, by definition, povidone iodine is a substance which does not contain alcohol. In construing the memo I would apply the rules of construction that apply to the interpretation of statutes, including the rule that words are to be understood in their ordinary sense unless a contrary intention plainly appears (section 1–02–02, NDCC) and the rule that words and phrases must be construed according to the context and

rules of grammar and the approved usage of the language (section 1–02–03, NDCC).

In applying those rules to the memo I arrive at the same conclusion as that of the majority opinion: povidone iodine may be used as a skin disinfectant for the purpose of the test for blood alcohol if the povidone iodine is an aqueous solution thereof, *i.e.*, if it does not contain alcohol. After reaching that conclusion I also agree that the evidence in this case does not indicate whether or not an aqueous solution of povidone iodine was used.

Without further evidence concerning the nature of the skin disinfectant used and whether, if it was not an aqueous solution, it could have affected the scientific accuracy of the test, I agree with the result reached by the majority opinion.

MESCHKE, Justice, dissenting.

Because the medical lab technician who collected Glaspey's blood sample failed to date the laboratory form, she was called to verify that date at the administrative hearing. The States Attorney also had her testify about obtaining the blood sample:

MR. PETERSON: What type of substance did you use to wipe off his skin before you took the blood sample?

MS. BITTNER: A Proviodine Iodine swab.

MR. PETERSON: Again, it says the container seal was intact before use, a sterile, dry, clean syringe and needle were used and a non alcoholic, non volatile skin disinfectant were used, and those marks are checked. Did you check those marks?

MS. BITTNER: Yes.

MR. PETERSON: And you did follow the procedures?

MS. BITTNER: Yes.

On cross-examination Glaspey's counsel elicited her confession that she did not know certainly that the Povidone–Iodine swab did not contain alcohol, in spite of her certification that she used a "Non–Alcoholic, non-volatile skin disinfectant." The majority opinion concludes that this uncertainty casts enough doubt on the scientific

reliability of the blood test to disqualify its admission as evidence.

In my view, however, any doubts arising from this conflicting evidence about a single detail of the blood sampling procedure affects only the evidentiary weight of the test results, not its admission as evidence. I believe that there was no abuse of discretion in admitting the blood test as evidence.

My reasons have been explained before. *See State v. Nygaard*, 426 N.W.2d 547, 550 (N.D.1988) (Meschke, Justice, dissenting) and *State v. Schwalk*, 430 N.W.2d 317, 325 (N.D.1988) (Meschke, Justice, concurring and dissenting). I would affirm.

Therefore, I respectfully dissent.